DMP:JPM
F.#2016R01041

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

KHALED ALHAJ,

           Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

18-356M

**TO BE FILED UNDER SEAL**

COMPLAINT AND AFFIDAVIT IN SUPPORT OF APPLICATION FOR ARREST WARRANT

(T. 18, U.S.C., §§ 2 and 641)

EASTERN DISTRICT OF NEW YORK, SS:

        LUIGI STOLFA, being duly sworn, deposes and states that he is a Special Agent with the United States Department of Agriculture, Office of Inspector General ("USDA-OIG"), duly appointed according to law and acting as such.

        Upon information and belief, in or about and between June 2015 and April 2017, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant KHALED ALHAJ, together with others, did knowingly and willfully embezzle, steal, purloin, and convert to his own use and the use of another, and without authority, sell and convey vouchers, money, and things of value of the United States and of a department and agency thereof, to wit: the United States Department of Agriculture, Food and Nutrition Service.

        (Title 18, United States Code, Sections 641 and 2)

The source of your deponent's information and the grounds for his belief are as follows:[1]

1. I am a Special Agent with the United States Department of Agriculture, Office of Inspector General ("USDA-OIG") and have been a Special Agent with USDA-OIG since October 2009. I am responsible for conducting and assisting in investigations into the activities of individuals and criminal groups responsible for federal food stamp benefit offenses in the United States. I have been involved in numerous investigations relating to food stamp benefit fraud, food stamp benefit trafficking, and other violations of federal law. These investigations are conducted both in an undercover and overt capacity. During the course of these investigations, I have conducted surveillance, executed search warrants, debriefed witnesses and reviewed documents related to fraud schemes. I have participated in investigations involving search warrants and arrest warrants. As a result of my training and experience, I am familiar with the techniques and methods of operation used by individuals involved in criminal activity to conceal their activities from detection by law enforcement authorities.

2. I have personally participated in the investigation of the offenses discussed below. I am familiar with the facts and circumstances of this investigation from my own observations, reports made to me by other law enforcement officers, and my review of records from USDA-OIG and other government agencies. In addition, when I rely on

---

[1] Because this affidavit is submitted for the limited purpose of establishing probable cause for the requested warrant, I have not set forth each and every fact learned during the course of the investigation.

statements made by others, such statements are set forth only in part and in substance unless otherwise indicated.

3. USDA-OIG is investigating unlawful food stamp benefit fraud occurring in the Eastern District of New York. Specifically, USDA-OIG is investigating individuals and entities that unlawfully process food stamp benefits without being authorized to do so by the USDA and unlawfully exchange cash for food stamp benefits.

BACKGROUND

A. The "SNAP" Program and Authorized Retailers

4. The federal government, through the United States Department of Agriculture, Food and Nutrition Service ("FNS"), administers the Supplemental Nutrition Assistance Program ("SNAP").

5. SNAP was formerly called and known as the "Food Stamp Program." SNAP utilizes federal tax dollars to subsidize low-income households, affording such households the opportunity to achieve a more nutritious diet by increasing their food-purchasing power.

6. In New York, individuals who receive SNAP benefits ("Recipients") no longer redeem their benefits by using paper food stamps coupons. Recipients now redeem their SNAP benefits electronically through the use of what is known as an Electronic Benefits Transfer ("EBT") card. The SNAP EBT cards operate much like automated teller machine ("ATM") cards used by banks. At the beginning of each month, a Recipient's EBT card is credited with a dollar amount of food stamps benefits for that month.

7. The EBT cards are used by Recipients to purchase eligible food items at retail food stores ("retailers") that are authorized by FNS to participate in SNAP and have

3

EBT terminals located in the stores. As a purchase is made, the retailer runs the EBT card through the EBT terminal. The Recipient enters a personal identification number ("PIN") on a keypad, and the amount of the purchase is deducted from the Recipient's EBT card. The EBT terminal generates a receipt for each transaction, and the balance remaining in the Recipient's account for the month is displayed on the receipt. The amount of the Recipient's purchase is then electronically credited to the retail food store's bank account, via previous arrangements between the retailer or his or her representative and the FNS.

8.  SNAP benefits may be accepted by authorized retailers only in exchange for eligible food items. According to FNS regulations, most edible items, with the exception of prepared foods, vitamins, and medicines, are eligible for purchase with SNAP benefits. Items such as beer, cigarettes, paper goods, and soaps are not eligible for purchase with SNAP benefits, and it is a violation of the rules and regulations governing SNAP to allow SNAP benefits to be used to purchase ineligible items. SNAP benefits may not lawfully be exchanged for cash under any circumstances. Exchanging SNAP benefits for cash is known as "trafficking" and is a violation of the rules and regulations governing SNAP. Lastly, retailers may not permit Recipients to run credit accounts and pay off such accounts with SNAP benefits from their EBT cards. Doing so is a violation of the rules and regulations governing the SNAP.

9.  Retailers who exchange SNAP benefits for cash usually do so at a discounted rate, e.g., 50 to 70 percent of the full value of the SNAP benefits. For example, a retailer engaging in trafficking would enter a $100 transaction against a Recipient's EBT card balance and give the Recipient only $50 or $70 in cash, depending upon the discount rate. This practice results in profiteering by traffickers, misuse of government funds

intended to provide food for needy families, and the creation of a market for stolen or fraudulently obtained SNAP benefits.

B.     The Investigation of the Store and the Defendant KHALED ALHAJ

10.    Through the course of my investigation, I have learned that employees at Community Merrick Deli, Inc. located at 109-14 Merrick Boulevard, Queens, New York (the "Store"), have been trafficking in SNAP benefits.

11.    I have reviewed USDA records which show that the Store was authorized by FNS to be a licensed Retailer of SNAP benefits by in or about October 2014.

12.    Based on information obtained from a confidential informant (the "CI"), including video taken by the CI of the inside the Store, the defendant KHALED ALHAJ was employed by the Store and operated the cash register and EBT terminal at the Store during the time of the investigation, among other activities.

13.    Beginning in or about May 2015, the CI, working under the direction of USDA-OIG agents, engaged in controlled SNAP transactions at the Store.[2]  Between May 2015 and June 2017, employees of the Store, including the defendant KHALED ALHAJ, redeemed a SNAP EBT benefits card used by the CI in exchange for cash at a discounted rate. The CI surreptitiously recorded many of these transactions. On each occasion where the CI engaged in a controlled purchase, before the CI entered the Store to conduct the

---

[2] The CI was paid for his/her cooperation approximately $50 each time he/she attempted to consummate an illegal SNAP benefits transaction under the direction of law enforcement. In my experience, the CI has been a reliable source of information and has been cooperative in undercover investigations. To my knowledge, the CI has no criminal history. The CI's information has been corroborated by independent evidence, including consensual recordings and observations by law enforcement. Specifically, law enforcement officers conducted audio and video recordings of many of the CI's controlled SNAP transactions at the Store discussed in this affidavit.

5

controlled transactions, special agents ensured that the CI did not have any cash on his/her person. After each controlled transaction, the CI surrendered to special agents the cash and receipt he/she received from employees of the Store. Based on my interviews of the CI and my review of the surveillance, I know the following with respect to transactions handled by the defendant ALHAJ:

      a.    <u>June 4, 2015</u>. The CI entered the Store and removed a soda from the refrigerator. The CI approached the counter where the defendant KHALED ALHAJ was working. The CI asked for $30 cash and handed ALHAJ the CI's EBT card. The defendant ALHAJ charged the CI's EBT card $47.50 and handed $30 in cash to the CI. Undercover footage made by the CI of the transaction shows that ALHAJ was the individual who processed the transaction.

      b.    <u>June 18, 2015</u>. The CI entered the Store and removed a beverage priced at $1.75 from a refrigerator. The CI reported that he/she approached the counter where the defendant KHALED ALHAJ was working. The CI asked for $40 cash in exchange for SNAP benefits. ALHAJ charged the CI's EBT card for $61.89 and handed $40 in cash to the CI.

      c.    <u>July 8, 2015</u>. The CI entered the Store and reported that he/she approached the defendant KHALED ALHAJ. The CI asked ALHAJ for $40. ALHAJ charged the CI's EBT card for $61.50 and handed $40 in cash to the CI. The CI reported that while in the Store, a customer called the defendant by the name "Ali."

      d.    <u>September 3, 2015</u>. The CI entered the Store and reported that he/she obtained two packages of cookies and brought them to the front counter. The CI observed the defendant KHALED ALHAJ behind the deli counter. The CI asked ALHAJ for

$60 cash back and handed ALHAJ an EBT card. ALHAJ charged the CI's EBT card for $90.75 and handed $60 in cash to the CI along with a bag containing the cookies.

    e. <u>September 24, 2015</u>. The CI entered the Store and reported obtaining a box of Pop Tarts priced at $2.99 from the shelf. The CI brought the item to the front counter where the defendant KHALED ALHAJ was working at the register. The CI asked ALHAJ for $80, and ALHAJ responded, in sum and substance, that he did not have $80 but could instead provide $70. The CI agreed to accept $70. ALHAJ charged the CI's EBT card for $103.59 and handed $70, the Pop Tarts, and a receipt. Undercover footage made by the CI of the transaction shows that ALHAJ was the individual who processed the transaction.

    f. <u>October 9, 2015</u>. The CI entered the Store and obtained a package of donuts priced at $0.75 and chips priced at $1.49 from the shelf. The CI brought the items to the front counter where the defendant KHALED ALHAJ was working at the register. The CI asked ALHAJ for $60 cash back. ALHAJ charged the CI's EBT card for $91.89 and handed $60 and the items to the CI. Undercover footage made by the CI of the transaction shows that ALHAJ was the individual who processed the transaction.

    g. <u>November 10, 2015</u>. The CI entered the Store at approximately 10:45 a.m., and reported that he/she did not observe the defendant KHALED ALHAJ in the Store. The CI approached the individual behind the cash register and asked that person for cash back on an EBT purchase. The individual responded, in sum and substance, that he did not handle transactions of that nature and that the CI should come back at 2:00 p.m. to see "Ali." The CI then exited the Store without making any purchases.

7

  h. <u>December 3, 2015</u>. The CI entered the Store and reported obtaining two granola bars and a small piece of prepackaged cake, all items totaling $4.00. The CI observed that the defendant KHALED ALHAJ was not working behind the register but in another part of the Store. The CI approached ALHAJ and requested $40 cash back. ALHAJ charged the CI's EBT card for $62.49 and handed $40 cash, the items, and a receipt to the CI.

  i. <u>December 18, 2015</u>. The CI entered the Store and reported obtaining a package of donuts costing $0.75 and a bag of potato chips from the shelf priced at $1.49. The CI then spoke with the defendant KHALED ALHAJ who was in the grill area. ALHAJ then contacted another employee and directed the employee the front counter. The unidentified employee then processed the transaction on the CI's EBT card for $78.25 and handed the CI a brown paper bag with the items and $50 in cash.

  j. <u>March 9, 2016</u>. The CI entered the Store and reported ordering a sandwich from the deli costing $5.00 and taking a bottle of soda costing $1.50 from the refrigerator. The CI then spoke with the defendant KHALED ALHAJ at the front counter and asked why ALHAJ had changed work shifts. ALHAJ responded, in sum and substance, that he was working in the mornings. The CI asked ALHAJ for $40 cash back. ALHAJ charged the CI's EBT card for $64.50 and handed $40 cash and a receipt to the CI. Undercover footage made by the CI of the transaction shows that ALHAJ was the individual who processed the transaction.

  k. <u>June 6, 2016</u>. The CI entered the Store and reported taking a cookie costing $1.00 from a shelf. The CI then walked to the register where the defendant KHALED ALHAJ was working and requested $60 cash back ALHAJ. ALHAJ charged the

8

CI's EBT card for $89.65 and handed the CI $60 cash and a receipt. Undercover footage made by the CI of the transaction shows that ALHAJ was the individual who processed the transaction.

   l. <u>September 13, 2016</u>. The CI entered the Store and reported taking two small packages of donuts costing $0.75 each from a shelf. The CI then walked to the register where the defendant KHALED ALHAJ was working and requested cash back from ALHAJ. ALHAJ charged the CI's EBT card for $61.75 and handed the CI a black plastic bag with the donuts and $40 cash inside.

   m. <u>November 3, 2016</u>. The CI entered the Store and reported taking one package of donuts costing $0.75 and a prepackaged piece of cake costing $1.00 from a shelf. The CI then walked to the register where the defendant KHALED ALHAJ was working and requested $40 cash back. ALHAJ charged the CI's EBT card for $61.99 and handed the CI a black plastic bag with the food items and $40 cash inside. Undercover footage made by the CI of the transaction shows that ALHAJ was the individual who processed the transaction.

   n. <u>January 12, 2017</u>. The CI entered the Store and reported taking two packages of cookies costing $0.75 each from a shelf. The CI then walked to the register where the defendant KHALED ALHAJ was working and requested $50 cash back. ALHAJ responded that the amount the CI had requested was, in sum and substance, "too much" and that ALHAJ could provide $20. ALHAJ stated that if the CI wanted more he could go to an adjacent shop. The CI then asked ALHAJ, in sum and substance, "oh that's yours too," to which ALHAJ responded in the affirmative. ALHAJ then charged the CI's EBT card for $31.50 and handed $20 cash to the CI.

    o. <u>February 6, 2017</u>.  The CI entered the Store and reported taking a prepackaged bun costing $0.50.  The CI then walked to the register where the defendant KHALED ALHAJ was working and requested $150 cash back.  ALHAJ responded that he could only provide $100 cash back.  The CI then asked ALHAJ if the adjacent store previously named by ALHAJ could provide the rest of the money, to which ALHAJ responded in the affirmative.  ALHAJ then charged the CI's EBT card for $150.49 and handed the CI $100 cash.

    p. <u>March 8, 2017</u>.  The CI entered the Store and reported taking a package of donuts costing $1.00.  The CI then walked to the register where the defendant KHALED ALHAJ was working and requested $160 cash back.  ALHAJ responded that he could only provide $70 cash back.  The CI then asked ALHAJ if the adjacent store previously given by ALHAJ could provide the rest, to which ALHAJ mumbled a response the CI did not understand.  ALHAJ then charged the CI's EBT card for $100.75 and handed the CI $75 cash.

    q. <u>April 19, 2017</u>.  The CI entered the Store and reported taking a package of donuts costing $0.99.  The CI then walked to the register where the defendant KHALED ALHAJ was working and requested $100 cash back.  ALHAJ responded that he could only provide $70 cash back.   ALHAJ then charged the CI's EBT card for $100.75 and handed the CI $70 cash back and the donuts.

  WHEREFORE, your deponent respectfully requests that the defendant KHALED ALHAJ be dealt with according to law.

  IT IS FURTHER REQUESTED that all papers submitted in support of this application, including this complaint and affidavit, be sealed until further order of the Court.

I believe that sealing these documents is necessary because, given the confidential nature of this investigation, disclosure would severely jeopardize the investigation in that it might alert the target of the investigation to the existence of an investigation and likely lead to the destruction and concealment of evidence and flight of the target.

Dated:   Brooklyn, New York
         April 20, 2018

                                        S. LUIGI STOLFA
                                        _____
                                        LUIGI STOLFA
                                        Special Agent, USDA-OIG

Sworn to before me on
the  20 day of April, 2018

        S/ CHERYL L. POLLAK
_____
THE HONORABLE CHERYL L. POLLAK
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK